J-S11044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN DAVID VANCE | : | No. 189 WDA 2021 |

Appeal from the Order Entered January 15, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000043-2018

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN DAVID VANCE | : | No. 652 WDA 2021 |

Appeal from the Order Entered May 7, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000042-2018

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN DAVID VANCE | : | No. 653 WDA 2021 |

Appeal from the Order Entered May 7, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000340-2018

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA

      Appellant   :

  :
  :
  :
  :

     v.   :

  :
  :
  :

JONATHAN DAVID VANCE   :   No. 743 WDA 2021

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Beaver County Criminal Division at
No(s): CP-04-CR-0000044-2018

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA

      Appellant   :

  :
  :
  :

     v.   :

  :
  :
  :

JOHN DAVID VANCE   :   No. 744 WDA 2021

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000339-2018

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA

      Appellant   :

  :
  :
  :

     v.   :

  :
  :
  :

JOHN DAVID VANCE   :   No. 745 WDA 2021

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000040-2018

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
            Appellant           :
                                          :
                                        :
            v.                          :
                                        :
JONATHAN DAVID VANCE      :    No. 746 WDA 2021

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0000041-2018

BEFORE: PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:        **FILED: SEPTEMBER 26, 2022**

The Commonwealth appeals from the orders granting in part and denying in part its pretrial motions to introduce evidence of prior bad acts by Jonathan David Vance ("Vance"). After a thorough review, we affirm.

The lead trial court presented the relevant factual and procedural history as follows:

> [Vance] is accused in seven different cases of sexually assaulting at various times, in various places, and in various ways, seven different prostitutes. Those cases are [pending at docket numbers] 40-2018, 41-2018, 42-2018, 43-2018, 44-2018, 339-2018, and 340-2018. Initially, the Commonwealth sought to try all seven cases together in one trial. [In] April [] 2019, the [trial] [c]ourt entered an order severing the cases for trial[, and the cases were thereafter assigned to several different jurists]. The Commonwealth [sought] to try [] case No. 43-2018[] first[,] and[, in July 2019, moved] to introduce evidence of the six other alleged assault victims and details of their assaults [pursuant to Pa.R.E. 404(b)]. The parties submitted a stipulated record for the [trial c]ourt to consider in entering a pretrial ruling on the admissibility of the evidence. [On January 5, 2021, the trial court heard argument from the parties and directed the stipulated record be entered into evidence.]

* * * *

The parties [agreed the stipulated record would include] the criminal complaints, preliminary hearing transcripts, and police interview transcripts in each case, as well as [Vance's] statement to police "that he had never picked up any prostitute or any of the identified victim/witnesses." [The following facts are gleaned from the stipulated record.]

Trooper Cramer's Investigation

Trooper [now Corporal Kevin] Cramer testified [at the preliminary hearings for these cases] that he was in charge of the investigation of a series of sexual assaults on prostitutes in the Beaver Falls area. The first person to report an assault was [C.M.], who told Beaver County Detectives Bob Herberle and Daniel Viscuso that she was assaulted on Thompson Run Road in North Sewickley Township. [Police brought C.M.] to Thompson Run Road, where they recovered an Access card and a health insurance card with her name on them. The next two women to report assaults to the police were [A.B.] and [S.M.] Trooper Cramer acquired other names, eventually identifying about twelve potential victims [in various locations, mostly in Beaver County]. The witnesses reported different vehicles being used in the incidents—a silver minivan; a white cargo van; a white (non-cargo) van; a little, blue, four-door car; a blue-green sedan; a white, little, old car; and a gold [sports utility vehicle ("SUV")] crossover with sliding doors.

Trooper Cramer testified that [Vance] was arrested, waived his [rights under **Miranda v. Arizona**, 384 U.S. 436 (1966),] and gave an interview on August 8, 2017. [At the interview, Vance denied ever picking up a prostitute or any of the identified victims or witnesses.] [P]olice [searched Vance's] house and vehicle [and] seized knives, guns, and cell phones from the house[,] [and] seized [a] vehicle, a silver Dodge Caravan with sliding doors. In the vehicle, they found knives, three pink car seats, black zip ties, and clothing. . ..

[C.M.] (Case Number 43-2018)

[C.M.], the alleged victim in case number 43-2018, was the first to report to the police, which she did while being questioned

- 4 -

concerning an unrelated incident at the jail. She testified at the preliminary hearing that she had been working as a prostitute when she first met [Vance] on Seventh Avenue at about 11:30 p.m. on May 6, 2017, her daughter's birthday. She was [thirty-two] years['] old at the time. [Vance] picked her up in a "silver van. It was a four[-]door van, newer model, and there was [three pink] car seats in the back." The van had sliding doors on both sides. [C.M.] had never met [Vance] before. They discussed exchanging money for sex[,] but did not discuss details. [Vance] drove [C.M.] to a spot along Thompson Run Road[, which was a place she would go to exchange sex for money]. [Vance exited and] walked around the van, and [C.M.] consensually gave him oral sex while she was crouched down outside of the van. Then, he put a pocketknife to her throat and proceeded to get on top of her on the ground, choke her, pull her pants down, and penetrate her rectum with his fingers. [C.M. described the pocketknife as having a four-inch blade.] [C.M. then] saw the knife [laying beside Vance] on the rocks, and when [Vance] grabbed it, she grabbed his hand and squeezed, cutting her thumb in the process. [C.M.] avoided his attempts to push and kick her. As [Vance] drove away, [C.M.] ran and grabbed the door handle to get the coat and purse that she left in the van. Her coat pockets contained her Access card and health insurance card. She was pulled by the van until her hand released and she skidded on the gravel. She heard metal hit against metal in the bushes, so she assumed that her items, including spoons, were thrown into the bushes. [P]olice later recovered [C.M.'s] Access card and health insurance card at the alleged scene.

[C.M.] testified that she had initially declined to contact law enforcement because she felt like they would blame her. She mentioned the incident while being interviewed in jail. She eventually led Trooper Cramer to the location of the assault.

[C.M.] "knew about several other women who had encountered this individual." [The other women included A.B., R.M., and A.M., victims in Vance's related cases, and [C.M.] testified "the one thing that we all had in common was the van with the car seats and everything . . . same vehicle, same guy . . . [d]ifferent incidents, different experiences, but same guy."]

[C.M.] participated in two lineups. The first time, she said that the perpetrator was either one of two people pictured. The

second time, she identified [Vance]. [C.M.] identified [Vance] in person at the preliminary hearing.

[In] August [] 2017, [] police filed a criminal complaint charging [Vance with several offenses, and the magistrate court held over for court the following charges:] involuntary deviate sexual intercourse [("IDSI")], aggravated indecent assault, terroristic threats, unlawful restraint, simple assault, indecent assault, and criminal solicitation[. **_See_** 18 Pa.C.S.A. §§ 3123(a)(1), 3125(a)(2), 2706(a)(1), 2902(a)(1), 2701(a)(2), 3126(a)(1), 902(a).]

<u>[A.B.] (Case Number 44-2018)</u>

[A.B.] testified that she was a prostitute in Beaver Falls. She was [twenty-five] in July 2017. Previously[,] around March 2017, [Vance] had paid her $40 for vaginal sex. On that occasion, he drove a newer silver Dodge van with one pink car seat in the back. Then, around midnight in June or July of 2017, [Vance] picked her up from 8th Avenue and 12th Street in the same van and took her to Thompson Run Road. He agreed to give her money. He walked around the back of the van, opened the passenger side door, and pressed a gun against her head. She felt the gun but never saw it. At gunpoint, he had her put her cell phone on the seat, get out of the car, and take off her pants and underwear. Still pointing a gun at her, he forced her to suck his penis, and then he had her bend over and had anal sex. He hit her with the gun and ejaculated inside her. He told her to lie on her stomach[;] she knelt on the gravel, and he drove off with her phone still in the car. A few days later, she saw him driving the van on 8th Avenue. Three weeks after the assault, she saw him again and got his license plate number. She texted the number to her friend James Todd. At the encouragement [of a later-deceased victim in a related case], [A.B.] reported the incident to Trooper Cramer.

[A.B.] identified [Vance] "instantly" in a photo array and again in person at the preliminary hearing.

[P]olice filed a criminal complaint in connection with the incident [in] August [] 2017, charging [Vance] with rape, [IDSI], aggravated assault, terroristic threats, unlawful restraint, simple assault, indecent assault, and criminal solicitation. [**_See_** 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3125(a)(2), 2706(a)(1),

- 6 -

2902(a)(1), 2701(a)(2), 3126(a)(1), and 902(a).] All charges were held for court.

[B.M.] (Case Number 40-2018)

[B.M.] testified that she had . . . worked as a prostitute in Beaver Falls. She was 54 years old in the spring of 2017. [B.M.] did not use illegal drugs. A year or two before 2017, [Vance] had picked her up to pay for sex. When she said he looked Italian, he told her he was Mexican. She got out of the car because he declined to pay her in advance.

[B.M.] testified that at about midnight on a rainy day in May or June 2017, [Vance] offered her a ride and picked her up again. He was driving a gold, silver, or champagne[-]colored minivan with one or two children's seats in the back. It smelled new, and he told her it was a Toyota. She smoked one of his cigarettes in the van. They had the same discussion about his being Mexican. Instead of driving her home, he continued to a graveyard, where she had never been before. She understood that there was an unspoken agreement [to exchange] sex for money.

[B.M.] testified that at the cemetery, she offered to go to the back of the van for sex. [Vance] went out the driver-side door, went around the back of the van, opened the passenger door, and grabbed her hair and put a gun to her head. While it was still dark and raining, he threw her to her knees beside the van and said to do what he told her and he would not kill her. He forced her to suck his penis, which became erect. Then he told her to stand up and turn around so he could penetrate her vagina, which he did. Then, he made her have oral sex again, and he punched her face, slapped her with the gun, pulled her hair, threw her on the ground, and ejaculated in her mouth.

[B.M.] testified that[,] during the oral sex, she thought [Vance] said to touch his knees, so she did. He said again [what she discerned was] that he touched his niece, and he asked her if she had been molested by a family member. He pulled her hair and had her lie on her belly behind the van, told her to stay down, kicked her, and drove off. The night of the incident, [B.M.] told her friend . . . about it. She [then] reported it to the police once she saw [Vance's] arrest on TV. She identified [Vance] as the perpetrator in two photographic line-ups, and again in person at the preliminary hearing.

[In] August [] 2017, [Vance] was charged with rape, [IDSI], aggravated indecent assault, criminal solicitation, terroristic threats, unlawful restraint, simple assault, and indecent assault. [*See* 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3125(a)(2), 902(a), 2706(a)(1), 2902(a)(1), 2701(a)(2), and 3126(a)(1).] All charges were held for court.

[B.R.] (Case Number 41-2018)

[B.R.] testified that she worked as a prostitute in April of 2017. She turned 45 [in] April [] 2017. She had a crack cocaine addiction at the time. [B.R.] had seen [Vance] pick up other prostitutes before and had spoken to him once or twice. However, she had never had sex with him before [] in the context of prostitution. [On an] afternoon [in] April [] 2017, when it was starting to get dark, [Vance] offered her a ride in his white pearl van as she was walking to Third Base, a bar in Beaver Falls, to celebrate her birthday. [B.R.] got in the van as she was walking along 17th Street. [Vance] told her happy birthday. [And] [i]nstead of driving to Third Base, he turned right on 7th Avenue and took her to Thompson Run Road.

[B.R.] testified that after [Vance] backed the van in and parked, he walked around the van, opened the passenger door, and told her to get out. [B.R.] refused, and [Vance] pulled her out of the van. He told her to take off her clothes, and she took off her pants and underwear. He hit the back of her head and knocked her onto the gravel outside of the van. [B.R.] testified that it felt like he hit her with something like a gun. He turned her from her back to her stomach. He held her shoulders and put his penis in her vagina. He did not try to have oral sex with her. He continued to punch and kick her on the ground. [B.R.] felt something hard hit her head and heard a banging noise, so she thought that he fired a gun by her head. She stayed on the ground while he got in the van and drove away. She walked back to Beaver Falls and met her friends for her birthday. She had a bump on her head.

[B.R.] testified that she saw [Vance] driving in Beaver Falls again about a week after the incident. She did not report the incident to the police until Trooper Cramer called her. [B.R.] identified [Vance] in two photographic lineups and again in person at the preliminary hearing.

[Vance] was charged [in] August [] 2017 with [*inter alia*] rape . . . aggravated indecent assault, indecent assault, unlawful restraint, terroristic threats . . . and simple assault. [**See** 18 Pa.C.S.A. §§ 3121(a)(1), 3125(a)(2), 3126(a)(1), 2902(a)(1), 2706(a)(1), and 2701(a)(2).] [These] charges were held for court.

[A.M.] (Case Number 42-2018)

[A.M.] testified that she is a prostitute. In April or May 2017, she was 32 years old. She is addicted to heroin and crack cocaine. [Vance] had previously given her money for consensual sex about [twelve] times over the course of two or three years. He would pay her $40 to $80 [] for oral and vaginal sex. During these encounters, he picked her up in different vehicles with car seats, including a little black car, a little silver car, and a silver van. They would go to secluded areas like graveyards and the river. They had gone to Bick Rock Park in New Brighton before. He had texted her to express an interest in tying her up, but she had declined.

[A.M.] testified that on an afternoon in April or May 2017, [Vance] picked her up in a silver van on 7th Avenue and 12th Street in Beaver Falls and took her to Big Rock Park in New Brighton. There was one car seat on a seat in the van. They had an implicit agreement that he would pay her for sex. They talked in the car. [A.M.] consensually engaged in oral and vaginal sex with him. He started to choke her, and she told him to stop. He stopped. [Then h]e choked her hard, got out a knife, and made her turn around, leaving a scar on her neck. The knife was a maroon, non-folding, 9- to 12-inch straight knife [though A.M. alternatively described it in a police interview as being a "little pocketknife"]. He continued to have vaginal sex[] without her consent. He drove away without her, and she did not see him or his car again [though she stated in a police interview that she saw him again two weeks later driving a little silver car]. He never paid her[, though she later asserted in a statement that Vance gave her $40.]

[A.M.] testified that when she was in jail on another matter, she reported the incident once she saw on the news that [Vance] was arrested. She identified [Vance] in a photographic lineup. At

the preliminary hearing, she identified [Vance] as the person who assaulted her.

In connection with the incident, [Vance] was charged [in August 2017 with the following offenses, which the magistrate held over for court following a preliminary hearing:] rape . . . aggravated indecent assault, unlawful restraint, terroristic threats, simple assault, and solicitation of prostitution. [*See* 18 Pa.C.S.A. §§ 3121(a)(1), 3125(a)(2), 3126(a)(1), 2902(a)(1), 2706(a)(1), 2701(a)(2), and 902(a).]

[R.M.] (Case Number 339-2018)

[R.M.] testified that she had been a prostitute on 8th Avenue in Beaver Falls for 13 years, stopped for three and a half years, and started back again. She was 42 years old in [the] fall of 2016. She was addicted to crack cocaine. In September or October 2016, [Vance] drove by 8th Avenue and 12th Street between 8:00 and 9:00 p.m. in a dirty, loud, older white Volkswagen. He waved at her, and she got in the car. She tried to talk, but he was quiet. He had his hand in his pants. He drove to Beaver Falls Cemetery [AKA Grandview Cemetery] and turned around to park halfway down the hill.

[R.M.] testified that [Vance] quickly got out of his door, went around the back of the car, opened the passenger door, and pulled her out by her neck. He threw her to the ground on her back, punched her face, and pulled down her pants, exposing her genitals. Her pants were completely off. He got on top of her and put his flaccid penis in her mouth. He stopped being on top of her and she said not to hurt her and that she would do whatever he wanted. He tried to put his still-flaccid penis in her vagina, but she did not know if there was any penetration. Then, he pulled up his pants, got in his car, threw her purse out the passenger side door, and drove away.

[R.M.] testified that she was a mess. She collected her purse, phone, and pants; however, she did not find some makeup. Her shirt and pants were ripped. She had red marks on her face and neck. She called her brother, who picked her up a few blocks away. Before contacting law enforcement, she warned other prostitutes that she was raped by a man in a white car, and they said to watch out for a silver van. She did not become involved in the investigation until Trooper Cramer called her in jail. She

wanted to help once he told her that her daughter, [A.B.], was raped. [R.M.] identified [Vance] in multiple photographic lineups and in person at the preliminary hearing.

[In] August [] 2017, [Vance] was charged in connection with the incident [and the following offenses were held over for court following a preliminary hearing:] attempted rape, attempted aggravated indecent assault, aggravated indecent assault, unlawful restraint, and indecent assault. [**See** 18 Pa.C.S.A. §§ 901(a) (3121(a)(1)); 901(a) (3125(a)(2)); 3125(a)(2); 2902(a)(1); 3126(a)(1).] The Commonwealth [amended] the information [in] October [] 2020 [to change attempted aggravated indecent assault to] [IDSI]. [**See** 18 Pa.C.S.A. § 3123(a)(1).]

[B.M.-B.] (Case Number 340-2018)

[B.M.-B.] testified that in March 2017, she had been a prostitute in Beaver Falls for about a year and a half. She was 38 years old at that time. She used heroin and crack cocaine. She considered [Vance] to be a friend and had offered to help him with his wife and children[:] "I was around him more than one time. It wasn't just somebody who just randomly picked me up out of the blue." [B.M.-B.] did not learn [Vance's] real name until he was arrested. Five or six times since March or April of 2016, he picked her up and exchanged money for oral and vaginal sex. Around the first time she met him, he said that he had a "role-playing rape fantasy," which she told him she was not willing to do, and he never asked her again. During their interactions, he drove different vehicles, including a dark blue two-seat work truck with a tank on the back, a little green Subaru, and a minivan. [B.M-B.] testified that she once saw a pink car seat in the van. [Vance] would take her to different places, including his work parking lot and Old River Road.

In March or early April 2017, around 1:30 p.m., [Vance] picked up [B.M.-B.] from Cannon Park in Beaver Falls. He had arranged to do so through text messages. He was driving a silver minivan with sliding doors and with the back seats folded down. He gave her some of the $70 he had agreed to pay her on the way, and he stopped at J's News so she could buy crack cocaine. From there, [Vance] drove her to a dirt road near Old River Road[, which is near Thompson Run Road,] where he had not taken her

- 11 -

before. However, [B.M.-B.] testified that she had gone to that location with somebody else.

Once they arrived, [Vance] provided marijuana, which they smoked, and they talked. [B.M.-B.] walked around the outside of the van to get to the back so they could have sex. [Vance] was standing by the driver's side door. Then he "backhanded" her into the van and tied a black zip tie around her right wrist. He knelt on her back and tried to tie a zip tie around he left wrist while she struggled. They were fully clothed the whole time. He stopped, let her get out of the van, told her she was perfect, cut the zip tie off her wrist, and drove her to Eastvale. None of her items were left in the car. She had a black eye, a rug burn, and bruised ribs.

[Vance] and [B.M.-B.] continued to interact. Five days after the assault, he texted her to ask if she wanted to do that again; she ignored him and then texted him and told him no.

[B.M.-B.] reported the incident to the police once she was out of jail on an unrelated charge, after a phone call from her friend . . .. [B.M.-B.] identified [Vance] in two photographic lineups and in person at the preliminary hearing. [B.M.-B.] talked about the incident with [A.M.], [A.B.], and [R.M.]. [In] August [] 2017, [Vance] was charged in connection with the incident with the following offenses that were held over for court following a preliminary hearing:] unlawful restraint, simple assault, and criminal solicitation[, later amended to patronizing prostitutes]. [**See** 18 Pa.C.S.A. §§ 2902(a)(1), 2701(a)(1), and 5902(e).]

Lead Trial Court Opinion, No. 43-2018, 3/29/21, at 2-3; **id**., Ex. 1 (Lead Trial Court Opinion, 1/15/21), at 4-20 (internal footnotes and citations to the record omitted; paragraphs re-ordered for clarity).

As noted above, the lead trial court severed the cases for trial. The Commonwealth sought to try No. 43-2018 first and, accordingly, filed a

pretrial motion pursuant to Pa.R.E. 404(b)[1] to introduce evidence of the other six alleged sexual assaults. On January 15, 2021, following briefing, argument, and consideration of the stipulated record, the lead trial court issued an opinion ("the lead opinion") and order ("the lead order") addressing the Commonwealth's Rule 404(b) motion at No. 43-2018. The lead order provided that A.B.'s testimony would be admissible for "the limited purpose[] of showing [Vance's] consciousness of guilt by contradicting his statement to police that he had never been with a prostitute, and to show the course and manner of investigation." Order, 1/15/21, at ¶ 1. The lead order further provided that testimony by B.M., A.M., R.M., and B.M.-B. was "admissible solely with regard to [Vance] picking her up while she worked as a prostitute, her description of [Vance's] vehicle, and her identification of [Vance], solely for the limited purpose of contradicting his statement to police that he had never been with a prostitute." *Id*. at ¶¶ 2, 4, 5, 6. Pursuant to the lead order, B.R.'s testimony was excluded in its entirety. *Id*. at ¶ 3. The lead order further precluded testimony by B.M.-B. and A.M. about Vance's "alleged rape

_____

[1] Rule 404(b)(1) provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

fantasy," as well as testimony by B.M. about Vance's alleged admission to "molest[ing] his niece [because it was] inflammatory[.]" *Id*. at ¶ 7. The lead order indicated lastly that the court retained "discretion to modify [its] ruling as circumstances develop or as the evidence during trial diverges from that which is anticipated." *Id*. at ¶ 8. The Commonwealth filed a similar Rule 404(b) motion in each of the related cases, and, in each case, the presiding judge adopted the lead opinion at No. 43-2018 and issued an order consistent with the lead order entered at No. 43-2018.[2]

_____

[2] In No. 42-2018 (A.M.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of A.M. in paragraph 4 and it does not preclude A.M. from testifying to Vance's alleged rape fantasy in paragraph 7. *See* Order, No. 42-2018, 5/7/21.

In No. 340-2018 (B.M-B.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of B.M-B. in paragraph 6 and precludes B.M. from testifying about Vance's alleged rape fantasy in paragraph 7. *See* Order, No. 340-2018, 5/7/21.

In No. 44-2018 (A.B.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of A.B. in paragraph 1, and specified that C.M.'s testimony "shall be admissible solely with regard to [Vance] picking her up while she worked as a prostitute, her description of [Vance's] vehicle, and her identification of [Vance], solely for the limited purpose of contradicting his statement to police that he had never been with a prostitute." *See* Order, No. 44-2018, 6/4/21.

In No. 339-2018 (R.M.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of A.M. in paragraph 5. *See* Order, No. 339-2018, 6/4/21.

In No. 40-2018 (B.M.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of B.M. in paragraph 2. *See* Order, No. 40-2018, 6/4/21.

The Commonwealth timely appealed the orders and certified pursuant to Pa.R.A.P. 311(d) that they will terminate or substantially handicap the prosecution. Both the Commonwealth and the trial courts complied with Pa.R.A.P. 1925.[3]

The Commonwealth raises the following issues for our review:

1. Did the trial court abuse its discretion in prohibiting the testimony of [A.B.], in which she alleges that [Vance] forcibly raped her at gunpoint under similar circumstances and around the same time as [C.M.'s] assault . . .?

2. Did the trial court abuse its discretion in prohibiting the testimony of [B.M.], in which she alleges that [Vance] forcibly raped her at gunpoint under similar circumstances and around the same time as [C.M.'s] assault . . .?

3. Did the trial court abuse its discretion in prohibiting the testimony of [B.R.], in which she alleges that [Vance] forcibly raped her at gunpoint under similar circumstances and around the same time as [C.M.'s] assault . . .?

4. Did the trial court abuse its discretion in prohibiting the testimony of [B.M.-B.], in which she alleges that [Vance]

_____

In No. 41-2018 (B.R.'s case), the trial court issued the same order as in No. 43-2018, except it included C.M. instead of A.M. in paragraph 4 and does not otherwise address A.M.'s potential testimony; the order also mistakenly includes paragraph 3 precluding B.R.'s testimony in its entirety. *See* Order, No. 41-2018, 5/25/21.

[3] Following the appeal at each docket, the Commonwealth moved to consolidate. Vance did not oppose the motions. This Court consolidated the cases on July 17, 2021. The lead trial court authored a comprehensive Pa.R.A.P. 1925(a) opinion at No. 43-2018. The trial courts presiding over the other cases adopted the lead Rule 1925(a) opinion filed in No. 43-2018.

forcibly raped her at gunpoint under similar circumstances and around the same time as [C.M.'s] assault . . .?

5. Did the trial court abuse its discretion in prohibiting the testimony of [A.M.], in which she alleges that [Vance] forcibly raped her at knifepoint under similar circumstances and around the same time as [C.M.'s] assault . . .?

6. Did the trial court abuse its discretion in prohibiting the testimony of [R.M.], in which she alleges that [Vance] forcibly raped her under similar circumstances and around the same time as [C.M.'s] assault . . .?

Commonwealth's Brief at 4-5.[4]  We note with disapproval that the Commonwealth's argument section is not divided into parts corresponding to its statement of questions involved.  *Cf*. Pa.R.A.P. 2116(a), 2119(a).  Instead, in its argument section, the Commonwealth first summarizes the facts of each case, and in so doing, highlights the similarities between the alleged assaults. It then devotes a section to each of its proffered theories of admissibility of the prior bad acts evidence pursuant to Rule 404(b)(2): (1) opportunity; (2) absence of mistake or accident; (3) identity; and (4) common plan or scheme. The Commonwealth lastly provides a generalized discussion of whether the probative value of the evidence outweighs its potential for unfair prejudice. For clarity, we address the Commonwealth's arguments regarding each of its

_____

[4] Both the Commonwealth and Vance filed one brief for the consolidated appeal.

- 16 -

proffered theories of admissibility *seriatim*, rather than address the issues as stated in the statement of questions involved.[5]

The Commonwealth's issues all concern the trial courts' orders granting in part and denying in part its Rule 404(b) motions to admit evidence of Vance's prior bad acts. For challenges to evidentiary rulings, our standard of review is abuse of discretion. **See Commonwealth v. Gilliam**, 249 A.3d 257, 271 (Pa. Super. 2021), *appeal denied*, 267 A.3d 1213 (Pa. 2021). An "abuse of discretion is not merely an error of judgment, but . . . rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Sitler**, 144 A.3d 156, 163 (Pa. Super. 2016) (*en banc*) (internal citation omitted). A discretionary ruling cannot be overturned simply because the reviewing Court disagrees with the trial court's conclusion. **See Commonwealth v. O'Brien**, 836 A.2d 966, 968 (Pa. Super. 2003).

---

[5] We note, again with disapproval, that the Commonwealth's Pa.R.A.P. 1925(b) statement of errors complained of on appeal mirrors the statement of issues in its brief and, accordingly, fails to specify which evidentiary theory of admissibility the trial courts allegedly misapplied when ruling on the Rule 404(b) motions. While we could find the Commonwealth's specific Rule 404(b) issues waived on this basis, we decline to do so because the lead trial court addressed each of them in its comprehensive Rule 1925(a) opinion, and the Commonwealth's omission does not prevent meaningful appellate review. **See Commonwealth v. Rogers**, 250 A.3d 1209, 1225 (Pa. 2021).

Relevance is the threshold for admissibility of evidence. ***See Commonwealth v. Cook***, 952 A.2d 594, 612 (Pa. 2008). Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a ***fact at issue*** more or less probable or supports a reasonable inference or presumption regarding a material fact." ***Commonwealth v. Drumheller***, 808 A.2d 893, 904 (Pa. 2002) (internal citation and quotations omitted; emphasis added); ***see also*** Pa.R.E. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."). A trial court may exclude relevant evidence if "its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Evidence that is not relevant is not admissible. ***See*** Pa.R.E. 402.

As noted above, Pa.R.E. 404 generally provides that prior bad acts evidence is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. ***See*** Pa.R.E. 404(b)(1). However, prior bad acts evidence may be admissible to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. ***See*** Pa.R.E. 404(b)(2). In determining whether the evidence is admissible, the trial court

must weigh its probative value against its potential to cause unfair prejudice.

As this Court has explained:

> To establish one of the exceptions set forth in Rule 404(b)(2), there must be a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question. Additionally, the term "unfair prejudice" in Rule 404(b)(2) means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. When weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence.

***Gilliam***, 249 A.3d at 271–72 (internal citations, quotations, brackets, and indentation omitted). Prior bad acts evidence thus may be admitted "in special circumstances where the evidence is ***relevant for some other legitimate purpose*** and not merely to prejudice the defendant by showing him to be a person of bad character." ***O'Brien***, 836 A.2d at 969 (internal citation omitted, emphasis added).

The Commonwealth first argues that the trial courts erred in denying, in part, its Rule 404(b) motions because the similarities in the prior bad acts evidence showed opportunity, *i.e.*, that Vance "had easy access to his victims," given that he lived in the area, frequented the locations where the women worked, and they were "members of a vulnerable population on which [Vance] thought he could prey with impunity." Commonwealth's Brief at 37-38.

Before addressing the merits of this argument, we must determine whether the Commonwealth has waived it. Pennsylvania Rule of Appellate

Procedure 2119 requires parties to include in their briefs "discussion and citation of authorities as are deemed pertinent." *See* Pa.R.A.P. 2119(a). When "an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." ***Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009) (citing, *inter alia*, Pa.R.A.P. 2119(a)); ***see also Commonwealth v. Russell***, 209 A.3d 419, 429–30 (Pa. Super. 2019) (explaining that this Court will not make an appellant's arguments and finding waiver of an undeveloped claim).

We observe that the Commonwealth devotes approximately one page to this issue and cites no authority apart from a section of the treatise *McCormick on Evidence*. **See** Commonwealth's Brief at 37-38. While the Commonwealth notes there is a dearth of Pennsylvania case law on this issue, it cites no additional secondary sources or other case law for their persuasive value.[6] **See** Commonwealth's Brief at 37-38. Because the Commonwealth

_____

[6] This omission is striking, since other secondary literature observes, "[w]hen offered to prove opportunity, [prior bad acts evidence] usually does not need to be similar to the charged conduct. In fact, in most cases similarity usually has no positive value in determining admissibility," and, moreover, "[t]he more similar the uncharged misconduct to the charged misconduct, the greater the risk that the jury will misuse the evidence for its impermissible character purpose." David P. Leonard. *The New Wigmore. A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 11.5 (2d ed. 2022). Further, "[w]hen the group of potential wrongdoers is large, [opportunity] evidence carries little probative value. When it is small, the evidence can have considerable weight." **Id**. at § 11.1. The Commonwealth

failed to develop its argument, with citation to pertinent authority, that the prior bad acts evidence showing similarity between the offenses is probative of Vance's opportunity, this argument is waived. *See Johnson*, 985 A.2d at 924; *Russell*, 209 A.3d at 429–30; Pa.R.A.P. 2119(a).

In its second argument, the Commonwealth contends that the trial courts erred in precluding the prior bad acts evidence because it was admissible to show absence of mistake or accident in anticipation of Vance's assertion of a consent defense. *See* Commonwealth's Brief at 38, 41.

One legitimate purpose for prior bad acts evidence is to show that "a defendant's actions were not the result of a mistake or accident, where the manner and circumstances of two crimes are remarkably similar." *Commonwealth v. Tyson*, 119 A.3d 353, 359 (Pa. Super. 2015) (internal citations and quotations omitted). A prior incident of sexual assault can be used to defeat an anticipated *defense* of consent in a case of sexual misconduct under the absence of mistake exception. *See id*. at 362-63.

The Commonwealth argues that the prior bad acts evidence is relevant to rebut Vance's anticipated consent defense. *See*, *e.g.*, Commonwealth's Brief at 41 (stating that, given "the volume of accusations against [Vance] . . . there was no mistake here as to consent. [His] actions were committed

_____

has failed to acknowledge or address these complexities about whether the contested evidence is probative of Vance's opportunity to commit the charged offense.

intentionally and not out of some misunderstanding of his victims' consent to sexual intercourse").

The lead trial court considered this argument and rejected it. As the court explained, "[Vance] has not raised consent as a defense[,] but has, under the record stipulated to by both parties, raised an entirely contradictory defense: that he did not commit the acts at all." Lead Trial Court Opinion, No. 43-2018, 3/29/21, at 5. The lead trial court further elaborated:

> Based on the stipulated record, consent is not at issue. [Vance] stated that he never picked up any prostitute or any of the alleged victims/witnesses. The identity of the sexual attacker is at issue. . . . In this case, however, based on the stipulated record, [Vance] has not raised a defense of consent. Rather, he raised to Trooper Cramer a completely contradictory defense that he has never picked up any prostitute nor any alleged victim/witness.
>
> * * * *
>
> Based on this record[,] where identity, and not consent, would appear to be the issue, evidence of the assaults upon the other alleged victims shall not be admissible at trial as evidence of absence of mistake or accident with regard to consent.

*Id*. at 5-6 (citing Lead Trial Court Opinion, No. 43-2018, 1/15/21, at 34-35).

Following our review, we discern no abuse of discretion by the trial courts. As noted above, the Commonwealth's stated purpose for seeking to admit this evidence was to prove absence of mistake or accident to rebut a defense of consent. **See** Commonwealth's Brief at 38, 41, 42. The trial court properly ascertained that this evidence is irrelevant to Vance's stated defense, which is not consent, but instead a complete denial that he had sexual

encounters with any of the victims. *See* Trial Court Opinion at 7; *accord* Vance's Brief at 17 (reiterating that "[Vance] has denied he was ever with, or even knew, any of the seven alleged victims"). The Commonwealth's stated purpose fails the threshold test of relevance to a fact at issue, namely, Vance's defense, which is identity, not consent. *See O'Brien*, 836 A.2d at 969; *Cook*, 952 A.2d at 612; *Drumheller*, 808 A.2d at 904.[7] Accordingly, the Commonwealth is due no relief.[8]

In its third argument, the Commonwealth argues that the trial courts erred in precluding its prior bad acts evidence insofar as it was offered to establish identity. *See* Commonwealth's Brief at 42. In ruling on prior bad acts evidence offered to prove identity, this Court has explained that,

> [t]o show identity, the prior crimes and the case at bar must have such a logical connection that proof of the prior crimes naturally shows the accused committed the crime being tried. Stated another way, the crimes must have such a correlation in their details that proof that a person committed those crimes makes it very unlikely that anyone else committed the crimes at trial.

---

[7] The Commonwealth also invokes the "doctrine of chances" in support of admitting the prior bad acts evidence to rebut a consent defense. *See* Commonwealth's Brief at 39-41. This stated purpose once again fails the threshold test of relevance based on the defense asserted, *i.e.*, identity, and, therefore, our analysis need proceed no further.

[8] We note that in each case, the trial court stated in its order that it retained the discretion to modify its ruling "as circumstances develop or as the evidence during trial diverges from that which is anticipated." *See*, *e.g.*, Lead Order, No. 43-2018, 1/15/21, at ¶ 8. Should Vance's defense change during trial, the Commonwealth may move for reconsideration of the trial courts' orders.

***Commonwealth v. Bidwell***, 195 A.3d 610, 619–20 (Pa. Super. 2018) (internal citations omitted). In comparing the offenses, the trial court must look for similarities in (1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. ***See Commonwealth v. Weakley***, 972 A.2d 1182, 1189 (Pa. Super. 2009). If the evidence is probative, the trial court must balance it against unfair prejudice and consider factors such as "the strength of the 'other crimes' evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and the degree to which the evidence probably will rouse the jury to overmastering hostility." ***Id***. at 1191 (internal citations omitted).

The Commonwealth argues the trial courts erred to the extent they denied the Rule 404(b) motions because the victims' testimony was probative of identity. ***See*** Commonwealth's Brief at 43. The Commonwealth argues the victims all "gave similar descriptions of [Vance's] physical characteristics and all identified [him] as their assailant over the course of the investigation." ***Id***. at 43. The Commonwealth also points out that four victims described a silver minivan with pink child safety seats. ***Id***. at 44.

Before addressing the merits of this issue, we must determine whether the Commonwealth has preserved it. We note, initially, that, in each case, the trial court found that part of the proffered testimony was relevant to

identity and, accordingly, ruled that the Commonwealth would be permitted to introduce testimony by the other victims that they were prostitutes and identifying Vance and describing his vehicle. *See*, *e.g.*, Lead Order, No. 43-2018, 1/15/21 at ¶¶ 1-2, 4-7; Lead Trial Court Opinion, No. 43-2018, 1/15/21, at 38.[9] The Commonwealth ostensibly means to argue that the details of each assault are relevant to establishing Vance's identity as the perpetrator in the others. However, it offers no argument, with citation to the record, that the details of the sexual assaults "have such a logical connection that proof of the prior crimes naturally shows the accused committed the crime being tried." *Bidwell*, 195 A.3d at 619–20. Instead, it focuses on the victims' identifications of Vance and their descriptions of his vehicle. *See* Commonwealth's Brief at 43-45 (discussing the victims' identification of Vance and "the silver minivan [as] the consistent item used" in several of the assaults). Given that the Commonwealth's argument addresses matters about which the witnesses will be permitted to testify—*i.e.*, Vance's identity as a patron of prostitutes and the vehicle he drove—to the extent the

---

[9] The only witness entirely precluded from testifying in the others' trials was B.R., whose testimony the trial court found would be cumulative. *See* Lead Order, No. 43-2018, 1/15/21, at ¶ 3; Lead Trial Court Opinion, No. 43-2018, 1/15/21, at 38 n.33. The Commonwealth makes no argument that the courts erred in concluding B.R.'s testimony would be cumulative, and so it has waived this issue. *See Johnson*, 985 A.2d at 924; *Russell*, 209 A.3d at 429–30; Pa.R.A.P. 2119(a).

Commonwealth contests the trial court's exclusion of testimony about the **sexual assaults** to prove identity, this argument is waived. **See Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007) (requiring that an appellate brief support its claims with pertinent discussion, with references to the record, and with citations to legal authorities, or risk waiver).[10]

The Commonwealth lastly argues that the trial courts erred in precluding its prior bad acts evidence offered to establish common plan or scheme. **See** Commonwealth's Brief at 42. In ruling on prior bad acts evidence offered to prove a common plan or scheme, this Court has explained,

> the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the

---

[10] Even if preserved, this argument would merit no relief. We find no abuse of discretion in the trial courts' conclusions that the **details of the sexual assaults** were not so "unusual and distinctive as to be like a signature." Lead Trial Court Opinion, No. 43-2018, 1/15/21, at 36 (citing **Bidwell**, 195 A.3d at 619-20). For example, the assailant used a firearm to threaten A.B., B.M, and B.R.; however, the perpetrator used a small pocketknife to threaten A.M. and C.M.; and he used no weapon on B.M-B. and R.M. **See id**. at 7, 9, 11, 13, 15, 16, 19. The perpetrator verbally threatened A.M., B.M., and C.M., but not A.B., B.M-B., and R.M. **Compare id**. at 49 (noting that "[Vance] made verbal threats in some instances") **with** Commonwealth's Brief at 33-34 (conceding there were verbal threats only to A.M., B.M., and C.M.). The type of sexual acts varied as well: only A.B. and C.M. were anally penetrated; all but R.M. and B.M-B. performed oral sex on the perpetrator; A.M., B.M., B.R., and R.M. were forced to perform vaginal sex. **See** Lead Trial Court Opinion, 1/15/21, at 7, 10, 11, 13, 14-15, 16, 19. Each victim was taken to one of three different locations. **Id**. at 51. Given the differences in the weapons used, verbal threats communicated, sexual acts, and locations of the assaults, we cannot say the trial court abused its discretion in concluding the Commonwealth "failed to demonstrate a distinctive or unusual signature-like logical connection." **Id**. at 37.

evidence reveals criminal conduct which is distinctive and [] nearly identical . . . . Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

*Gilliam*, 249 A.3d at 272 (internal citation omitted).

The Commonwealth argues that the prior bad acts evidence is admissible to show that Vance had a common plan or scheme "to victimize prostitutes in Beaver Falls." Commonwealth's Brief at 45. The Commonwealth gives a generalized account of the common plan as follows: Vance would "drive to downtown Beaver Falls, lure in a prostitute on the street with the promise of money, take her to a secluded area, violently physically and sexually assault her, and then leave her stranded." *Id*. at 45-46. According to the Commonwealth, the "temporal closeness of each of the seven assaults is evidence of a common plan or scheme," in that they occurred "in a tight, nine-month timeframe." *Id*. at 49. The Commonwealth also emphasizes the "geographic proximity" in that the offenses all occurred in Beaver Falls within

"mere blocks of one another," and that Vance used a vehicle in each case and could therefore "easily and quickly move about the city." *Id*. at 52. The locations where the victims were taken also "share common characteristics: they are secluded . . . close to where the victims were picked up, and they are often utilized as areas where these women could have sex for money away from the prying eyes of law enforcement." *Id*. at 53-54. The Commonwealth also observes that the "encounters escalated from seemingly consensual to physically violent and sexually assaultive." *Id*. at 57. The Commonwealth also claims Vance "used a signature combination of violence and sex to dominate his victims," including "weapons, physical violence, verbal threats, or a combination of all three to compel [the victims'] compliance." *Id*. at 58. The Commonwealth further claims there are "striking similarities" in the sexual acts because four victims reported vaginal sex; two reported anal sex; and six reported oral sex. *Id*. at 60. The Commonwealth lastly notes that the victims were all adult white women with histories of prostitution and substance abuse. *Id*. at 61.

The trial courts considered the Commonwealth's arguments and rejected them:

> [A]dmission of evidence of other bad acts or criminal conduct subject to Rule 404(b) remains a very high standard indeed. The Commonwealth must show, under the unique facts and circumstances of each case, a distinctive pattern or plan of criminal tactics, with details that are not insignificant, and surrounding circumstances of extraordinarily similar criminal acts which assure that the criminal conduct is so distinctive and nearly identical as to be the signature of the defendant, and thereby

effectively eliminates the possibility that anyone other than the [d]efendant could have committed these crimes. In deciding whether the Commonwealth has met this burden, the [c]ourt is authorized to use its discretion, based on the unique facts and circumstances of this case.

In this case, the Commonwealth argues that the victims were all female prostitutes from Beaver Falls who were picked up within a few blocks, taken to another location, and then assaulted by a person each now identifies as [Vance. However,] physical and sexual violence against prostitutes . . . is simply not as uncommon in Pennsylvania as the Commonwealth portrays . . ..

Rather, when the unique details and circumstances of each case are considered, it becomes apparent that there are, in fact, many differences between the cases, and the details can hardly be considered insignificant. The ages of the victims range widely, from 25 to 54. Some victims had numerous encounters with [Vance] in the past, while others had few or none. Some describe a silver van with car seats, while others describe different types of vehicles. Some describe the use of a knife, while others a gun, while some describe the use only of hands. Some describe choking while others do not. Different types of sexual acts are described, with some involving oral and vaginal sex, some oral and anal sex, some vaginal sex only, and one where no sexual act was completed. The time frame of the assaults range[s] from October of 2016 to August of 2017. The locations of the assault likewise vary, with some describing a dirt road in New Sewickley, others Grandview Cemetery in Big Beaver, and another Big Rock Park in New Brighton. These considerable differences belie any claim that the cases establish a predictable pattern of criminal sexual behavior unique to [Vance]. Rather, they establish only unproven allegations of commission of the same class of crime.

There are simply very stark difference[s] among the cases. For example, [B.M-B.] testified that she knew [Vance], wanted to help him with his wife and children, purchased and ingested drugs with [him, and he] backhanded her, failed in an attempt to tie her hands, told her she was perfect, drove her home, and had communications with her after the fact. That is quite different from[, *e.g.*, C.M.], who testified that she never met [Vance] before, [and] began consensually performing oral sex on him for money when he put a knife to her throat, dragged her from the vehicle, shoved her face into the gravel, put his weight upon her,

pulled her clothes down, and digitally anally penetrated her before driving away and leaving her behind. These cases cannot reasonably be referred to as sharing the same criminal tactics or playbook. The similarities they share are merely that both involve accusations not yet resulting in a conviction of assault upon a female prostitute.

Among all the cases, perhaps the most similar to the circumstances of [C.M.] is the case of [A.B.]. Both describe a silver van, are taken to the same location, and occur within two months of each other. [C.M.'s] testimony involves allegations of oral and anal penetration, as does [A.B.'s]. Yet, important differences remain[, including that] [C.M.] was menaced with a knife, [while] [A.B.] was threatened with a gun. [C.M.] was 32 years old; [A.B.] was 25. [C.M.] had never met [Vance] before while [A.B.] had previously encountered him.

* * * *

The [c]ourt . . . does not view the differences, even between [C.M.] and [A.B.] as the mere presence of some inconsistencies. These details are not insignificant; they are precisely the type of details relied on in previous cases to justify admitting this type of evidence. . . .

It is true that some of these similarities are the same type of similarities that supported the result in [**Commonwealth v. Cosby**, 224 A.3d 372 (Pa. Super. 2019), *vacated on other grounds*, 252 A.3d 1092 (Pa. 2021)]. For example, in **Cosby** the assault on the victims "occurred in a setting controlled by [Appellant], where he would be without interruption and undiscovered by a third party." 224 A.3d at 402. That is also true here. What is different here, however, is that the alleged victims are all prostitutes, and the activity of prostitutes routinely occurs in just such a setting, even absent assault. Indeed, some of the alleged victims admitted to previously conducting their business, even with other patrons, at the very same locations where they accuse [Vance] of assaulting them. To the extent there is similarity in the sense of a sexual and physical assault on a female prostitute in a relatively private location, such conduct simply does not establish distinct, unique, nearly identical . . . criminal tactics. . . .

> The [c]ourt concludes, under the facts and circumstances of this particular case, that the Commonwealth has failed to meet the standard for admissibility under Rule 404(b). Therefore, evidence of the sexual assaults on the other victims shall not be admissible to prove a common scheme or plan in this case.

Lead Trial Court Opinion, No. 43-2018, 3/29/21, at 9-11 (internal citation omitted).

Mindful that our standard of review is abuse of discretion, and that this Court may not overturn a trial court's decision simply because it would have come to a different conclusion, **see O'Brien**, 836 A.2d at 968, we decline to disturb the trial courts' rulings. Preliminarily, we note what is arguably the most salient similarity between the cases, namely, the vehicles used by the assailant to pick up his victims.[11] However, we must also acknowledge the trial courts' findings that there were variations across the cases, including the

_____

[11] C.M. described a silver van with three pink car seats; A.B. described a silver Dodge van with one pink car seat; B.M. recounted a gold or silver or champagne minivan, which Vance described to her as a Toyota, with one or two children's seats in it; B.R. described Vance's vehicle as a white pearl van; A.M. described a silver van with one car seat; B.M-B. knew Vance to drive several vehicles, including a minivan with a pink car seat—and on the day of her assault, Vance was driving the silver minivan with the back seats folded down. R.M. was something of an outlier in that she described her assailant's vehicle as a dirty, loud, older white Volkswagen. However, we also note that, while a van was common to six of the cases, there were still some distinctions, including the color of the van, whether there were car seats in the vehicle, and, if so, the number of car seats. We further reiterate that—as observed above—the trial courts' orders permit testimony from each victim, apart from B.R., identifying Vance as a patron of prostitutes as well as his vehicle.

ages of the victims;[12] whether the victims had known Vance prior to the assaults, and, if so, how;[13] the weapons used to forcibly coerce the victims into nonconsensual sex acts;[14] the specific location of the assaults;[15] and, importantly, the details of the sexual assaults.[16] Given the several points of

---

[12] C.M. was thirty-two years old; A.B. was twenty-five; B.M. was fifty-four; B.R. was forty-five; A.M. was thirty-two; R.M. was forty-two; and B.M-B. was thirty-eight.

[13] Not all the victims had previously encountered Vance: C.M. and R.M. had not previously met Vance. A.B. had previously met Vance; B.M. had previously met him and had agreed to exchange sex for money, though the arrangement was never completed; B.R. had previously seen and met Vance; A.M. had previously engaged in consensual sex with Vance about twelve times over two or three years; and B.M-B. knew Vance and considered him to be a friend.

[14] C.M. described a pocketknife; A.B. testified that Vance held her at gunpoint and pistol whipped her; Vance held B.M. at gunpoint; B.R. testified her assailant hit her with something she inferred was a gun; A.M. testified that Vance held a knife to her throat; R.M. testified that Vance used his fists, rather than another weapon, to coerce her; B.M.-B. testified that Vance "backhanded" her and attempted to tie a zip tie around her wrist.

[15] Vance took C.M., A.B., and B.R. to Thompson Run Road; he took B.M. and R.M. to Grandview Cemetery; he took A.M. to Big Rock Park in New Brighton; and he took B.M-B. a dirt road near Old River Road (near Thompson Run Road).

[16] C.M. performed consensual oral sex before Vance choked her and anally penetrated her with his fingers; A.B. performed oral sex before Vance forced her into anal sex; Vance forced B.M. to perform oral sex on him and then he forced vaginal sex on her, before again coercing her to have oral sex, and punching her, slapping her with the gun, throwing her on the ground, and ejaculating in her mouth; B.R. did not perform oral sex on Vance—he instead vaginally penetrated her; Vance forced A.M. to perform vaginal sex at knifepoint following consensual oral and vaginal sex; Vance forced oral sex on

variance in the sexual assaults themselves, and regardless of whether this Court would have come to a different conclusion, we cannot conclude that the trial courts abused their discretion, or committed errors of law, when they determined that the similarities in the criminal conduct did not evince distinct or unique criminal tactics. *See* Lead Trial Court Opinion, No. 43-2018, 3/29/21, at 8-10 (internal citation omitted); *see also Commonwealth v. Cosby*, 224 A.3d 372, 398 (Pa. Super. 2019), *vacated on other grounds*, 252 A.3d 1092 (Pa. 2021) (stating that the common plan exception helps to identify a perpetrator based on his "commission of extraordinarily similar criminal acts on other occasions. The exception is demanding . . ., requiring nearly unique factual circumstances in the commission of a crime, so as to effectively eliminate the possibility that it could have been committed by anyone [else] . . .."); *Commonwealth v. Hicks*, 156 A.3d 1114, 1125–26 (Pa. 2017) (observing that "[i]n further explaining the logical connection standard, this Court has noted [that] much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts") (internal citation and quotations omitted); *cf. Commonwealth v. Rush*, 646 A.2d 557, 561 (Pa. 1994) (finding, in a murder and burglary case, no error in admission of prior bad acts evidence where the defendant had

---

R.M. and attempted vaginal sex, but R.M. was unsure if he managed to penetrate her; Vance was unable to inflict sexual assault on B.M-B.

- 33 -

committed a prior burglary that "contain[ed] uniquely similar attributes sufficient to allow the prior conviction into evidence," such as taking a knife from each burglarized apartment, using it to stab the occupant, before cleaning it and leaving it at the scene).[17]  Accordingly, the Commonwealth is due no relief.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  09/26/2022

---

[17] As we affirm the trial courts' orders based on the conclusion that the proffered evidence does not prove a common plan or scheme, we need not reach the issue of whether the probative value of the evidence outweighs the risk of unfair prejudice to Vance.